UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff,*<br><br>-against-<br><br>IRIS CAPITAL SECURITIES S.A.L., ANTOINE KHALIFE, and ONE OR MORE UNKNOWN PURCHASERS OF SECURITIES OF TELVENT GIT, S.A.,<br><br>*Defendants.* | Civil Action No.: 11-cv-03794 (TPG)<br><br>ECF CASE<br><br>**DECLARATION OF ANTOINE KHALIFE IN OPPOSITION TO THE SEC'S APPLICATION TO DISMISS THE COMPLAINT WITHOUT PREUDICE AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

Pursuant to 28 U.S.C. § 1746, Defendant Antoine Khalife declares the following under penalty of perjury under the laws of the United States of America:

1. I am the founder and principal of Defendant Iris Capital Securities S.A.L. ("ICS"). Until its business was destroyed by this lawsuit, ICS was a money management firm located in Beruit, Lebanon.

2. I make this declaration in opposition to the SEC's application to dismiss the complaint without prejudice pursuant to Fed. R. Civ. P. 41(a)(2) and in support of Defendants' cross-motion for summary judgment, to explain to the Court the serious harm the SEC's baseless allegations have had, and continue to have, on Defendants' reputation and business interests.

3. The SEC concedes that, almost a year and a half after filing the complaint, and after taking extensive discovery, including a full voluntary document production by Defendants and my deposition, there is no evidence that Defendants had any connection to any of the parties involved in the Telvent acquisition—much less evidence that I received material non-public information from an insider in violation of a fiduciary duty.

4. In our *Wells* letter from September 2011, in ICS' motion to intervene and answer to the complaint, in my declarations in support of ICS' motion to vacate the freeze order, and in

my deposition testimony, Defendants have offered a detailed and consistent account of the legitimate market research underlying the decision to invest in Telvent. That showing stands unrebutted, and there is no genuine issue of material fact to preclude an award of summary judgment.

5. Although there has never been any basis for the SEC's allegations, this lawsuit has completely and permanently destroyed ICS' business in Lebanon, which can never be recovered. Moreover, the SEC's reckless allegations, which were picked up by the New York and Swiss press, have also caused serious harm to my reputation, hampering my other money management business in Geneva. Enough is enough. Since the SEC has admitted that it has no evidence to support its claims, Defendants are entitled to a full and final vindication and should not be left to face the constant threat of further litigation based on the same meritless allegations. The Court should grant summary judgment and dismiss the complaint with prejudice.

**The Destruction of ICS' Business in Lebanon**

6. At the outset of this lawsuit, the SEC obtained an *ex parte* freeze order (the "Freeze Order"), seizing the proceeds of ICS' Telvent trades. The SEC based its application for the Freeze Order on the allegation that ICS' purchase of Telvent call options on May 27 (which turned out to be a few days before the announcement of Schneider's acquisition of Telvent) was "highly unusual and suspicious," and was "a strong indication of trading based on knowledge of material non-public information." *See* **Exhibit A** at ¶ 11. The SEC neglected to inform the Court that many of those options were not new purchases but a rollover of options ICS purchased in April that were not set to expire until mid-June. The rollover was exculpatory—if ICS had inside information that the Acquisition was to be announced on June 1, it would not have incurred the transaction costs associated with extending the expiration date of the options until

2

July. This was an egregious omission from the SEC's application for the Freeze Order, which misled the Court about the trading activity at the heart of this matter.

7. As a result of the Freeze Order, nearly $2.7 million held in the U.S. omnibus account of ICS' Lebanese depository bank (Bank Audi) were frozen for a year. Bank Audi, in turn, relied on the Freeze Order as an excuse to seize more than $4 million in assets in Lebanon belonging to ICS and its clients. The seizure of a large part of ICS' operating capital ultimately resulted in the revocation of the company's Lebanese banking license. Without its banking license, which has been permanently revoked and can never be restored, ICS is unable to operate its business. Moreover, my relationship with the clients whose funds were seized has been irreparably damaged.

8. The SEC's allegations in this lawsuit, which were picked up by the New York and Swiss press—including the fantasy that I am a participant in a Geneva-based insider trading ring—have also had a serious negative impact on my other investment management business, MKT Capital S.A., which is based in Geneva, Switzerland.

**The SEC's False Allegations Are Interfering With My Current and Future Business Ventures**

9. On March 9, 2012, the *New York Post* ran an article (a copy of which is attached hereto as **Exhibit B**) repeating the SEC's claim that I am part of "a Switzerland-based group of moneymen" who were allegedly "passing around illegal insider tips about American and European companies, including Arch Chemical of Norwalk, Conn." As I explained at my deposition, this is utter nonsense. I have no relationship with members of the imagined "cabal," and I certainly never received or traded on the basis of material non-public information from them or anyone else. In fact, I never made any trades at all in the securities of Arch Chemical, which was the subject of another lawsuit in which I was not a party, *SEC v. Compania*

*Internacional Financiera S.A.*, 11-cv-4904 (Oetkin, J.). In that case, like this one, the SEC was forced to concede, after extensive discovery, that there was no evidence to support the insider trading allegation.

10. On March 18, 2012, a leading Swiss newspaper, *Le Matin dimanche*, ran an article (a copy of which is attached hereto as **Exhibit C**), repeating the allegation that I made "suspicious transactions concerning the Telvent stock." Again, outside of the SEC's imagination, there was nothing "suspicious" about my Telvent trades, as I had already demonstrated long before March 18.

11. As a direct result of these press reports, two Swiss banks in which clients of MKT Capital had deposited their funds (BNP and Credit Suisse) refused to continue doing business with me. Attached as **Exhibit D** is an email, dated May 14, 2012, from my contact at BNP explaining that after the "recent press article" regarding the SEC's allegations came to the attention of the bank's compliance department, the bank determined that it "did not wish to take any risk of its reputation in the current context." The email goes on to state that the bank's decision to cancel its contract with me is "irrevocable."

12. As a result of the banks' response to the SEC's allegations, MKT Capital lost at least 12 of its customers whose funds were deposited in those banks.

13. The SEC's insider trading claims have also interfered with another of my business projects—a Cayman Island-based fund I launched earlier this year, called MKT Tactical Fund. Although I was eventually able to set up the fund, the existence of the SEC's baseless allegations caused significant delays and nearly caused the Cayman Islands authorities to withhold the necessary approvals altogether.

14. Not only has ICS been destroyed, but the SEC's false allegations are threatening to damage my other business ventures, unless the claims are dismissed with prejudice. Banks and potential customers have made it clear that they are reluctant to do business with me until I obtain clear and final confirmation that the SEC will not pursue me on these claims. The SEC's offer to withdraw the lawsuit without prejudice does not give these sophisticated entities and individuals the comfort they require. They are suspicious as to why the SEC will not terminate the litigation with finality and assume that its refusal to do so must mean that there will be future litigation about these issues. They are not willing to deal with this uncertainty.

15. In sum, the situation has become intolerable. Although the SEC now admits there is no evidentiary basis for its insider trading claim against me, its reckless allegations have caused, and are continuing to cause, serious harm to my reputation, my business interests and my customers. Defendants respectfully request that the Court end this case once and for all by granting summary judgment dismissing the claim with prejudice.

Dated: Geneva, Switzerland
October 19, 2012

_____
ANTOINE KHALIFE