## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>IRIS CAPITAL SECURITIES S.A.L., ANTOINE KHALIFE, and ONE OR MORE UNKNOWN PURCHASERS OF SECURITIES OF TELVENT GIT, S.A.,<br><br>        Defendants. | Civil Action No. 11-cv-3794 (TPG)<br><br>ECF CASE |

## DECLARATION OF ERNESTO G. AMPARO
## IN SUPPORT OF THE SEC'S RULE 56(d) APPLICATION

I, Ernesto G. Amparo, hereby declare under personal knowledge as follows:

1. I am employed by the Securities and Exchange Commission, Enforcement Division, as a Senior Counsel.  I was the primary investigating attorney on this matter, which began as a foreign unknown purchaser insider trading case in June 2011.

2. I submit this affidavit in support of the SEC's Rule 56(d) application and in opposition to Defendants' motion for summary judgment.

### If the Case Were To Litigate, What Facts Would The SEC Seek To Establish Its Case?

3. In order to establish its claims of insider trading against the Defendants, the SEC will need to establish by a preponderance of the evidence that the Defendants traded while in possession of material nonpublic information ("MNPI"), that they knew or should have known was passed to them in violation of a fiduciary duty, for a personal benefit to the tipper. *See SEC v. Obus,* 692 F.3d 276, 286 (2d Cir. 2012).

4.      To prove tipping and insider trading activity, the SEC thus needs to establish a link or conduit of MNPI between the Defendants and a source who was aware of the Telvent merger prior to the June 1, 2011 merger announcement ("Telvent Source").  To accomplish this goal, the SEC needs to discover relevant facts concerning with whom the Defendants spoke, met, and otherwise communicated, prior to their trades in Telvent.

5.      The SEC also needs to discover the bases on which the Defendants made their trades, in comparison with their overall trading strategies, and to test the Defendants' theories of trading.

6.      The SEC also needs to examine the relationship and communications between the Defendants and two other Geneva based traders, Yomi Rodrig and Lucien Selce, whose trading patterns in Telvent and other securities overlap (the "Geneva Traders"), as set forth below.  The purpose of such discovery would be to establish a conduit of MNPI and possible network or ring of insider trading.

7.      If the SEC were to litigate this case, it would first demand that the Defendants respond to its outstanding interrogatories and document requests issued on April 25, 2012 [Dkt. 65-3], now long overdue, seeking information concerning, among other things (1) their trading patterns in Telvent and other companies; and (2) their relationships and communications with the Geneva Traders, and other potential sources of MNPI.

8.      The SEC would also issue seek discovery from ICS employees and other contacts of the Defendants, including the Geneva Traders, with knowledge of the Defendants' trading practices and strategies, and their whereabouts and activities in April-May 2011.

9.     The SEC would seek unfiltered electronic discovery from the Defendants, the Geneva Traders, and Telvent Sources, to test their purported trading strategies and explanations, and discover potential leaks of MNPI concerning Telvent and other companies.

10.    The SEC would seek to obtain comprehensive productions of the Defendants' email, phone, and mobile device accounts directly from the providers, from which Defendants' communications with Telvent Sources and other potential sources of MNPI could be examined.

11.    The SEC would also demand from Defendants an audit trail to evidence their usage of the TradeStation database on which they claim they based their trading decisions. *See* Khalife Dep. Tr. [Dkt. 61-16] at 124-25.

12.    The SEC would engage in discovery of other potential sources of MNPI, such as the accountants, lawyers, bankers, and other agents that worked on the Telvent merger and other relevant corporate transactions.  Armed with lists of persons who worked on Telvent and other comparable deals, the SEC would then be able to cross-index and compare records to determine any patterns in communication activity, evidencing potential leaks of information.

**How are these Facts Reasonably Expected to Create a Genuine Issue of Material Fact?**

13.    The SEC can establish that Defendants traded on the basis of MNPI in at least two ways – first, it can establish through direct evidence, such as phone and text records, emails, meeting notes, witness testimony, and other evidence -- that MNPI more likely than not passed from Telvent Sources to Defendants.

14.    The SEC also is able to prove its case through circumstantial evidence, such as by demonstrating suspicious trading patterns in Telvent and other companies at relevant times by Defendants and the Geneva Traders; communications and meetings between the Defendants and the Geneva Traders, and other potential sources of MNPI; and unbelievable explanations about

3

the Defendants' and Geneva Traders' trading, from which a juror may infer insider trading activities. *See Compania,* 2012 WL 1856491, *5 (S.D.N.Y. May 22, 2012) ("It is not inconceivable that the SEC could establish insider trading through circumstantial evidence alone. *See, e.g., SEC v. Singer,* 786 F.Supp. 1158, 1164 (S.D.N.Y.1992) ("Courts in the Southern District have held that circumstantial evidence such as suspicious timing of trades, contacts between potential tippers and tippees, and incredible reasons for such trades provide an adequate basis for inferring that tipping activity has occurred.")).

15.     The missing discovery described above will be used to establish the SEC's claims under both direct and indirect theories.

**What Effort has the SEC Made to Discover Critical Facts?**

16.     On April 25, 2012, the SEC issued interrogatories and document requests to the Defendants. [Dkt. 65-3]. The Defendants have not responded to those requests.

17.     On April 27, 2012, the SEC took the telephonic deposition of Antoine Khalife in Lebanon. That deposition left open many questions concerning the Defendants' trading decisions and strategies, and their relationship with the Geneva based traders, Yomi Rodrig and Lucien Selce. For example, Mr. Khalife claimed that he and Lucien Selce both disliked Rodrig (Khalife Dep. at 154:2 ("I hate that guy")) and would walk across the street if he saw him, and that he had "no contact with him" in relevant times (*Id.* at 157), but could not explain why Rodrig happened to trade at the same time frame as him in Telvent, Genzyme, Dendrite and potentially other stocks. Khalife Dep. at 156-58. Khalife also would not answer questions regarding any of his clients on whose behalf he traded, including whether Selce was a client, or whether Selce had an account at Audi Saradar bank, claiming such information was protected by Lebanese "banking secrecy laws." *See* Khalife Dep. at 150:4-5; 157:17-19).

18.     The SEC obtained some documents through informal productions from the
Defendants during initial settlement discussions.  This documentation was incomplete, as it did
not contain critical information sought by the SEC in its document requests, such as (1)
contemporaneous evidence reflecting the Defendants' trading decisions; (2) information
concerning Defendants' trading in other companies, as outlined below; or (3) Defendants'
communications with the Geneva Traders and other potential Telvent Sources.

19.     The SEC has obtained some documents from foreign authorities identifying
persons that worked on the Telvent Merger, but has not, as yet, attempted to contact any of these
individuals through Hague Convention or other international protocols.

**Why was the SEC Unsuccessful in Obtaining Critical Facts?**

20.     As the SEC set forth in its Reply Brief in support of its Motion to dismiss [Dkt.
65], discovery in this case has just begun.  There has been one telephonic deposition.

21.     Defendants have not responded to the SEC's interrogatories and document
requests, nor provided their initial disclosures under Rule 26.  The parties have not even agreed
on a Rule 16 or 26 discovery schedule.

22.     Though the Defendants produced some documents to the SEC during settlement
discussions, they did not produce any contemporaneous evidence to support their story of why
they traded in Telvent when they did.  *See* April 24 Tr. at 18-19.  They did not provide an audit
trail of the TradeStation database, as they indicated they would try to do.  Khalife Dep. Tr. at
124-25.  They also produced no documents evidencing any communications with the other
Geneva Traders whose trading overlapped with theirs.

23.     The SEC litigation team on this action did not access or review any records resulting from the subpoenas or informal requests issued by SEC litigation team in the *Compania* case, as claimed by Defendants (ICS Br. at 13).

24.     This case basically has been stayed since the SEC filed its motion to dismiss on May 21, 2012 as Defendants and Audi Saradar bank litigated a side dispute.

**Suspicious Trading Patterns of Defendants and the Geneva Traders**

25.     Based on trading records and other information I reviewed or received, I have reason to believe that Antoine Khalife, Lucien Selce, and Yomi Rodrig traded in the following public companies under suspicious circumstances, namely prior to public announcements of acquisition or merger discussions or activities with French companies.

26.     As set forth below, the term securities includes common stock, options on common stock and/or contracts for difference based on common stock.

**Genzyme Securities (GENZ)**

27.     On or about July 6, 2010, Lucien Selce ("Selce"), through an entity or entities he controlled, purchased securities of Genzyme Corporation ("Genzyme").  In July 2010, Genzyme was an American biotechnology company headquartered in Cambridge, Massachusetts, whose common stock was listed and traded on NASDAQ.

28.     On or about July 14, 2010, defendant Khalife, through an entity or entities he controlled or through an omnibus account, purchased Genzyme securities.

29.     During the period encompassing July 6, 2007 and July 14, 2007, Genzyme was engaged in undisclosed, confidential acquisition discussions with Sanofi S.A. ("Sanofi"), in which Sanofi sought to acquire all of Genzyme's common stock at a premium above market

price. Sanofi, then known as Sanofi-Aventis, is a French pharmaceutical company headquartered in Paris, France.

30.     On July 23, 2010, the Wall Street Journal and other news media reported that Sanofi was engaged in informal acquisition discussions with Genzyme.

31.     On July 23, 2012, or shortly thereafter, Selce and Khalife sold their Genzyme securities for profit.

32.     In 2011, Sanofi completed its acquisition of Genzyme.  Genzyme continues to operate as a 100%-owned subsidiary of Sanofi.

**Dendrite International Inc. (DRTE)**

33.     On or about February 20, 2007, defendant Khalife, through an entity or entities he controlled or through an omnibus account, purchased the securities of Dendrite International, Inc. ("Dendrite").  In February 2007, Dendrite was an American company based in New Jersey whose common stock was listed and traded on NASDAQ.  Dendrite provided sales force automation technology for the pharmaceutical industry.

34.     On or about February 20, 2007, Lucien Selce, through an entity or entities he controlled, purchased the securities of Dendrite.

35.     On or about February 21, 2007, Yomi Rodrig ("Rodrig"), through an entity or entities he controlled, purchased the securities of Dendrite.

36.     During the period encompassing February 20, 2007 and February 21, 2007, Dendrite was the subject of an undisclosed, confidential acquisition proposal from Cegedim S.A. ("Cegedim") to acquire all of Dendrite's common stock for $16 per share.  Cegedim is a French global software company headquartered in Boulogne-Billancourt, France.

37.     On or about February 27, 2007, Rodrig sold his Dendrite securities for a profit.

38.     On March 2, 2007, Dendrite announced that Cegedim had agreed to acquire Dendrite for $16 per share.

39.     On March 2, 2007, Khalife and Selce sold their Dendrite securities for a profit.

## American Power Conversion Inc. (APCC)

40.     On or about October 3, 2006, defendant Khalife, through an entity or entities he controlled or through an omnibus account, purchased the securities of American Power Conversion Corp. ("American Power"). In 2006, American Power was an American company based in Rhode Island whose common stock was listed and traded on NASDAQ. American Power provided electrical distribution and industrial control and automation technologies.

41.     Between about October 10, 2006 and October 30, 2006, Rodrig, through an entity or entities he controlled, purchased the securities of American Power.

42.     On or about October 27, 2006, Selce, through an entity or entities he controlled, purchased the securities of American Power.

43.     On October 30, 2006, American Power announced that it had agreed to be acquired by Schneider Electric S.A. ("Schneider") in an all cash transaction at $31 per share, a premium of 30% above the closing price of American Power's common stock immediately preceding the announcement. Schneider is a French company headquartered in Rueil-Malmaison, France that provided electrical equipment and control systems technologies to the electric power industry. Schneider also purchased Telvent – providing further indication of a common leak of MNPI.

44.     On October 30, 2006, following the announcement, Khalife, Selce, and Rodrig sold all or most of their American Power securities for a profit.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

_____
Ernesto G. Amparo

Dated:  November 13, 2012
At Washington, DC